## Weed v. Bucks County

684

George T. Kelton, for petitioner.
Peter A. Glascott, for respondent.

FULLAM, J., December 31, 1965.—The question presented in this condemnation case is whether or not the condemnor's attempted withdrawal and rescission of the condemnation proceeding was effective.

The following facts are virtually undisputed and are amply supported by the record:

1. The property condemned consists of an irregularly shaped tract of 45.006 acres of land in Middletown Township, Bucks County, Pa. Part of the tract is located within a triangle formed by the intersection of Hulmeville-Trenton Road, Emilie-Woodbourne Road and Oxford Valley-Bristol Road. The remainder of the tract is located to the east of the last-mentioned road, and, near its southeastern corner, also has frontage on Township Road 331. The tract has a frontage of 481.66 feet on the Emilie-Woodbourne Road; 2,043.75 feet on the Hulmeville-Trenton Road; approximately 960 feet on the west side of the Oxford Valley-Bristol Road; approximately 1,800 feet on the east side of the same road and 714.68 feet on Township Road 331.

2. The property is immediately adjacent to, and surrounded by, the large residential developments of Levittown and Fairless Hills. Hulmeville-Trenton Road, roughly parallel to and about three quarters of a mile southeast of U. S. Route 1, is the principal northeast-southwest artery running through Fairless Hills and the western portion of Levittown; the Emilie-Wood-

bourne Road is one of the principal northwest-southeast arteries traversing Levittown and connecting it with Route 1 and the area to the west thereof. The property has great actual and greater potential commercial value.

3. As of the date of the condemnation, and until the zoning was changed, as hereinafter related, the entire frontage of the tract on Hulmeville-Trenton Road, comprising about nine acres, was zoned C-Commercial; the balance of the tract was zoned residential.

4. On January 29, 1962, the Bucks County Commissioners duly adopted a resolution condemning the property for park purposes. In relevant part, the condemnation resolution provided:

"That the County of Bucks hereby condemns, designates, sets apart, and dedicates the below described lands of Henry Weed, situate in the Township of Middletown, County of Bucks and Commonwealth of Pennsylvania, the same being needed for county park and recreation purposes and the same to be taken over and used for said public purposes, that the said Henry Weed be notified accordingly, and the value thereof to be either fixed by agreement with the owners thereof, or fixed by a jury of view to be appointed, as provided by law".

5. On June 26, 1963, Mr. Weed and his counsel appeared at a meeting of the county commissioners and requested that the commercially zoned portion of the premises, at the intersection of Woodbourne Road and Trenton Avenue, be released from the condemnation and returned to him. It was pointed out to the commissioners at that time that this part of the property was extremely valuable for commercial purposes, would be costly for the county to pay for and would be of only minimal use in connection with the proposed park. Mr. Weed and his attorney were told that they "would have to clear it with Mr. Pierson", referring to Robert Pier-

son, Executive Director of the Bucks County Park Board. Mr. Weed and his attorney went immediately to Mr. Pierson's office to pursue the request, but were advised by Mr. Bruce Singer, assistant director of Bucks County Parks: "Well, it is not any use, because I know Mr. Pierson won't give any of that ground up".

6. On August 14, 1963, there appeared on the agenda of the Middletown Township Board of Supervisors at the regular monthly meeting the following item:

"Request of Robert Pierson to re-zone County condemned Park area to Residential".

At that meeting, the chairman of the Middletown Township Board of Supervisors announced that Mr. Robert Pierson, Executive Director of the Bucks County Park Board, had requested the Middletown Township Supervisors to rezone an area of ground at the corner of Woodbourne Road and Trenton Road, which was then zoned commercial and which the county had condemned back to its previously zoned (residential) classification. The township commissioners duly adopted a motion to hold a public hearing to consider this proposed rezoning.

7. On September 25, 1963, the Middletown Township Supervisors held a public meeting to consider, inter alia, the rezoning request referred to above. Mr. Bruce Singer, assistant director of county parks, was present at the meeting. The chairman of the supervisors made the announcement: "The County Park Board requests that the Township re-zone the land back to Residential. This would supposedly have no effect on the value of the land because the value is considered from at the time of condemnation". Mr. Singer spoke in behalf of the proposed change.

8. Counsel for Mr. Weed chanced to be present at the supervisors' meeting of September 25, 1963, referred to above, and advised the supervisors that his client had not been informed of the proposed change and knew

nothing about it; that, to the extent that Mr. Weed had any interest in the property, he would be opposed to the proposed rezoning, but that it would be his understanding that it was the position of the county that Mr. Weed no longer had any interest in, or title to, the property. Mr. Kelton related to the supervisors the property owner's attempts to have the commercial property released from the condemnation and emphasized to the county representatives present that if the property were rezoned residential, the property owner would not want to get the property back. The township solicitor agreed with the property owner's attorney as to the effect of the county's request. Ultimately, at that meeting, the matter was tabled, because the township planning commission had not passed upon it, and also because the supervisors decided to afford a further opportunity for Mr. Pierson to explain to the planning commission and to the supervisors the county's reasons for wishing the requested rezoning.

9. On September 27, 1963, Mr. Weed filed the petition in the present proceeding for the appointment of viewers, and the board of view was appointed.

10. At a meeting on October 9, 1963, the Middletown Township Supervisors again considered the adoption of an ordinance to change the zoning of the tract in question, but further action was postponed until the meeting of November 13, 1963, "due to Mr. Pierson's inability to attend this meeting".

11. No action in reference to the proposed rezoning was taken at the meeting of November 13, 1963. However, on December 27, 1963, Mr. Pierson appeared before the board of supervisors and explained that the reason for wanting the Weed property rezoned to residential was that the property "has only been condemned and, until it has been obtained, there is the possibility of dropping any portion of it and this might allow for strip commercial along a park area which would be very unsatisfactory".

12. On January 10, 1964, the township supervisors voted to advertise the proposed rezoning of the Weed property, and to hold a public hearing thereon on February 14, 1964.

13. On February 14, 1964, over the objection of Mr. Weed and his counsel, the township supervisors adopted an ordinance changing the zoning of the property from C-Commercial to R-1-Residential.

14. Two of the Middletown Township Supervisors, Messrs. Canby and Farley, who had been in office throughout 1963, were elected County Commissioners of Bucks County at the November elections in 1963, and took office as county commissioners in January of 1964. On at least one occasion between January 1, 1964, and February 14, 1964, they attempted informally to dissuade their former colleagues from enacting the proposed zoning change.

15. On January 4, 1965, approximately two years after the original condemnation, and almost one year after the change of zoning, the County Commissioners of Bucks County adopted a resolution purporting to discontinue the condemnation.

16. Between September 27, 1963, when the viewers were appointed, and January 4, 1965, when the resolution of discontinuance was enacted, the board of view conducted its view of the property and held two hearings, but no report has as yet been filed with the court.

17. At no time prior to January 4, 1965, did the county commissioners take any official action to disaffirm the condemnation.

18. At no time prior to January 4, 1965, did the Bucks County Commissioners take any official action to withdraw, or disassociate the county from, the request for the rezoning of the property which had been made by Mr. Pierson, Executive Director of the Bucks County Park Board.

19. During the period of at least six weeks prior to the enactment of the zoning change ordinance by the

Middletown Township Supervisors, at least two of the Bucks County Commissioners had actual knowledge of all of the representations and requests made by Mr. Pierson; and this fact, in turn, was known by Mr. Weed and his counsel.

## DISCUSSION

. Procedurally, the present question initially came to the attention of the court when the county petitioned for, and obtained, a rule to show cause why the viewers should not return the file and all of the records in the case to the office of the prothonotary, and take no further action with respect to entering an award. Subsequently, a hearing was held, and it was stipulated that the hearing judge should enter an interlocutory order determining whether the jury of view should proceed to determine damages as for a completed condemnation, or merely for damages sustained by virtue of the uncompleted condemnation proceeding, under the Act of August 9, 1955, P. L. 323, sec. 2433, 16 PS §2433.

The statute provides:

"In case the county shall discontinue any proceedings taken providing for the appropriation, injury or destruction of any land, property or materials prior to the entry upon, taking or appropriation thereof and before judgment therein, the said county shall not thereafter be liable to pay any damages which have been or might have been allowed, but all costs upon any such proceedings had thereon shall be paid by the county, together with any actual damages, loss or injury sustained by reason of such proceeding, and the amount of the same may be determined and fixed by the court in which such proceeding was pending".

Unquestionably, the attempted discontinuance occurred "before judgment therein". The key question is whether the attempted discontinuance occurred "prior to the entry upon, taking or appropriation . . ." of the property.

Neither our own research nor that of counsel has unearthed any precedent squarely ruling the present question. It is, of course, axiomatic that no government or governmental agency can constitutionally "take" private property or apply it to public use without just compensation being first paid or secured. It is also clear that in modern concept, the term "taking", in a constitutional sense, includes not only the seizure of full, legal and beneficial ownership and the physical taking or destruction of private property, but also includes the notion ". . . that when a person is deprived of any of certain rights in and appurtenant to tangible things, he is to that extent deprived of his property, and his property may be taken, in the constitutional sense, though his title and possession remain undisturbed; . . . 'that, whenever the lawful rights of an individual to the possession, use or enjoyment of his land are in any degree abridged or destroyed by reason of the exercise of the power of eminent domain, his property is, pro tanto, taken, and he is entitled to compensation' . . . 11 McQuillan, Municipal Corporations (3rd ed.) §32.26, p. 312, citing Cheves v. Whitehead, 1 F. Supp. 321", quoted with approval in Miller v. Beaver Falls, 368 Pa. 189, 196, 197 (1951). See also Department of Highways v. Spear, 15 Bucks 340 (1965).

It is also clear that ordinarily, in the absence of contrary statutory provisions, the condemnor may discontinue condemnation proceedings at any time prior to final judgment, or prior to the actual physical taking of the property: Franklin Street, 14 Pa. Superior Ct. 403; Speer v. Monongahela Railroad Co., (No. 1), 255 Pa. 211; Reinbold v. Commonwealth, 319 Pa. 33 (1935). The reasons underlying this rule are clearly set forth, and the authorities reviewed, in the Reinbold case, supra: the public officials should have an opportunity to find out how much a proposed improvement is going to cost before finally deciding whether to obligate

the taxpayers to pay for it. And so long as the public body has not ousted the property owner from his possession, or permanently damaged or destroyed the property, the property owner's rights are fully protected if he is permitted to retain the property and to obtain whatever damages he actually suffered by reason of the condemnation proceeding itself.

It seems to us to follow that just as the public officials should have the right, if they choose, to learn the amount of the viewers' award before finally deciding to go through with the proceeding, so also they are bound, in order to avail themselves of this right, to refrain from taking any action which will seriously and perhaps permanently affect the value of the land proposed to be condemned. The fundamental premise on which these legal principles rest is that a condemnor may rescind or withdraw from a proposed condemnation if, and only if, the property itself remains unchanged thereby.

As applied to the facts of the present case, if the commissioners wished to preserve the right to defer final decision until after the amount of damages had been ascertained, they had the duty to refrain from attempting to alter the result by their own exercise of dominion over the property, and from using their interim "ownership" to advance the government's interests as to adjacent property.

On the present record, it is impossible to avoid the conclusion that the condemnor was responsible for actions which were instrumental in bringing about a change in the zoning classification of part of the condemned property, with resulting diminution in value. We recognize that the township supervisors, and not the county commissioners, enacted the amendatory ordinance. Nevertheless, it is entirely clear that the change was initially requested by the condemnor, acting through the Executive Director of the Bucks County Park Board, and that the staff of the county park

board was active in promoting the proposed amendment throughout its entire history.

It appears to be the position of the county that the record does not disclose that Mr. Pierson or the park board were authorized by the county commissioners to take the steps which they did. Admittedly, it does not appear that the county commissioners ever expressly authorized the request for, or processing of, the zoning change. However, it does appear that Mr. Pierson and his staff were vested with full responsibility for guiding and directing the development of the county park program in all of its various aspects. And it cannot be doubted that the actions taken by Mr. Pierson and his staff were taken in an effort to carry out these responsibilities; it cannot be suggested that they had any ulterior private motive. The change must have been sought either (a) in the erroneous belief that it would reduce the condemnation award, or (b), more probably, to enable the condemnor to give up the costly part of the property but prevent its non-park utilization by the owner, or (c) to protect adjacent park areas. In short, it is clear that, although perhaps not expressly authorized by the county commissioners, the actions of Mr. Pierson and his staff were within the scope of their general authority and within the scope of their employment by the county.

This conclusion is further fortified by the fact that the property owner's request for a release of part of the property from the condemnation was referred by the commissioners to Mr. Pierson, And finally, even if we were to assume that Mr. Pierson's actions were entirely unauthorized, the fact remains that two of the three county commissioners who took office in January of 1964 had actual knowledge of all of Mr. Pierson's activities in connection with the zoning change; yet the county took no action to disaffirm Mr. Pierson's activities, nor even to advise the property owner that

the zoning change request was unauthorized, so as to alert the property owner to the desirability of appealing from the amendatory ordinance.

With the benefit of hindsight, it appears that the property owner might have been well advised to appeal the amendatory enactment. But it cannot be said to have been his duty to do so, any more than it would have been his duty to try to evict the condemnor if it had taken physical possession of the property. The decision as to whether or not to exercise dominion over the property was the condemnor's to make.

It is our conclusion from the evidence in this case that the condemnor exercised dominion over the property in such a way as to make it presently impossible to restore the property to the status quo ante; and, therefore, that the purported rescinding resolution of January 4, 1965, came too late and is void.

It should perhaps be noted that no other solution to the problem is satisfactory. At first blush, it would seem possible to permit the withdrawal of the condemnation, but to require the county to pay, as damages by reason of the condemnation proceeding, the difference in value between the property in its original zoning and the property as rezoned. But there are several obstacles to such a solution. In the first place, it is by no means clear that the statute contemplates the inclusion of such an item as damages suffered by reason of the condemnation proceeding itself. In the second place, such a solution would probably cost the condemnor a substantial sum of money, without the acquisition of any assets. And finally, it is conceivable that in such event the property owner might at some future time be successful in having the property again rezoned to commercial, and would thus wind up with both the penny and the cake.

It is, of course, quite true, as argued by the county, that a zoning classification is not necessarily perman-

694

ent. There is also room for persuasive argument that the residential zoning classification of the corner and road frontage portion of this property is patently unreasonable and could be set aside through appropriate legal proceedings. However, under all of the circumstances, justice requires that all risks of remedying the situation should be borne by the condemnor, which brought the situation about. Having put beyond reach the restoration of the status quo, the condemnor must pay for the property condemned.

ORDER

And now, December 31, 1965, for the reasons set forth in the foregoing opinion, it is ordered that the resolution of the Board of Commissioners of Bucks County adopted January 4, 1965, purporting to discontinue the within condemnation, is declared to be void and of no effect, and the viewers are directed to carry out their duties as originally assigned and to file their report in due course.